UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
------------------------------------------------------------------------X
SHORELINE POOLS, INC. and,
DAVID LIONETTI,

                Plaintiffs,

      v.

MARK LIONETTI,

                Defendant.
------------------------------------------------------------------------X

Case No.:

**COMPLAINT AND
JURY DEMAND**

     COMES NOW Plaintiffs Shoreline Pools, Inc. ("Shoreline") and David Lionetti ("David,

and, with Shoreline, "Plaintiffs"), by and through their undersigned counsel, and as and for their

Complaint against Mark Lionetti ("Mark" or "Defendant") state and allege as follows:

## NATURE OF THE CASE

     1.    At its core, this case is about a complete betrayal of trust by a manipulative,

duplicitous, greedy, self-interested man. Mark is a substantial shareholder and former officer in a

privately held family pool construction, renovation, service and maintenance business, Shoreline.

While he was an officer and shareholder of Shoreline, Mark stole assets and resources rightfully

belonging to Shoreline; diverted corporate opportunities away from Shoreline; had Shoreline pay

for him to have a full-time personal butler/assistant; collected a substantial salary and hundreds of

thousands of dollars in distributions from Shoreline, while abstaining from performing any

meaningful work for the company; started a competing business with his son (then an employee

of Shoreline) and, using Shoreline's confidential and proprietary information, poached several

Shoreline employees and diverted, at least, a dozen of Shoreline's clients/customers to that

competing business; and commenced multiple legal proceedings (in which he denied that he and/or

David were shareholders of Shoreline) that he knew to be frivolous.

2.     In addition, Mark repeatedly published to third parties knowingly false and derogatory statements about David, accusing him of, among other things, stealing money from their mother; unlawfully and improperly acquiring his interests in Shoreline from their mother and father and a trust he created and, later, from their brother; improperly using Company funds for personal purposes; and improperly and unlawfully terminating Mark's employment with Shoreline and trying to ruin him financially by lying to him and stealing from him.

3.     This Complaint asserts, on behalf of Shoreline, claims against Mark for theft, conversion, breach of fiduciary duty, faithless servant, and tortious interference with contracts. Shoreline seeks millions of dollars in compensatory damages, including, on its faithless servant claim, for the forfeiture of all salary paid to Mark by Shoreline and the disgorgement of benefits received by him during his period of disloyalty. The Complaint also asserts, on behalf of David, a claim against Mark for defamation.

## JURISDICTION AND VENUE

4.     This Court has subject-matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 because it is a civil action between citizens of different states (diversity), and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

5.     Venue for this action is properly laid in this District pursuant to 28 U.S.C. § 1391(b)(1), because the plaintiffs both reside, and do business, in this judicial district; and (b)(2) because a substantial part of the events and omissions giving rise to these claims occurred in this judicial district.

## PARTIES

6.     Shoreline is a corporation organized and existing under and pursuant to the laws of the State of Connecticut, with its principal place of business located at 393 West Avenue, Stamford,

Connecticut. Shoreline is a closely-held private pool construction, service, and maintenance company started decades ago by David's and Mark's father.

7.      David is an individual citizen of the United States residing at 88 Blueberry Drive, Stamford, Connecticut. At all times relevant hereto David was, and is, President of Shoreline. Pursuant to a November 3, 2004 letter, David's mother, Valentina ("Valentina"), initiated a transfer to each of her three sons – David, Mark, and Brian – of 30% of the issued and outstanding stock of Shoreline.

8.      Mark is an individual citizen of the United States residing at 1121 Orange Hibiscus Lane, Palm Beach Gardens, Florida. Until September of 2023 Mark was President of Shoreline Pools Service (Shoreline's service and maintenance division) and Vice President and Corporate Secretary of Shoreline (purportedly assisting David in overseeing the overall operation of the company). Pursuant to the above-referenced letter, Mark also received 30% of the issued and outstanding stock of Shoreline from Valentina as set forth above. He continues to date to own that stock, representing a 30% equity interest in Shoreline.

## FACTUAL BACKGROUND COMMON TO ALL CLAIMS

9.      Mark started to work at Shoreline in or about April of 1969. Over time, he assumed increased responsibilities at Shoreline and, consequently, he became an officer and director of the corporation, primarily responsible for the company's service and maintenance division. As an officer of the Company and a substantial shareholder of Shoreline, he owed the company and its other shareholders a fiduciary duty of loyalty and good faith. He was duty-bound to put the interests of the corporation ahead of his own interests.

10.      David started to work at Shoreline in or about May of 1970 upon his graduation from college. Over time, he too assumed increased responsibilities at Shoreline and, consequently,

in accordance with his father's explicit direction, he became its President. In that role, David assumed responsibility for the entirety of the Company's business.

11.     From January 1, 2018 through September of 2023, Mark received W-2 wages from Shoreline totaling $2,986,730.84.

12.     In or about 2014, Mark began to spend more and more time in Florida at his residence located in Palm Beach Gardens, Florida. First, he was in Florida from approximately October 1 until Memorial Day. Commencing in or around January 1, 2018 Florida became Mark's primary residence and, commencing then, he rarely, if ever, even visited the company's offices. The busiest times of year in the pool business are in the spring and in the fall. In the spring customers rush to get their pools ready and serviced so that the pools can be opened by Memorial Day. In the fall customers rush to close their pools before the harsh weather comes. Mark stayed in Florida during these busy times and contributed little or none of his time to the business of the Company. His primary focus related to Shoreline was to protect his and his son's compensation.

13.     Commencing in or around January 1, 2018, when Florida became his primary residence, Mark stopped performing any real substantive work for Shoreline and he stopped coming to the office with any regularity. Although he was abstaining from doing any work, Mark insisted that Shoreline continue to pay him – and Shoreline continued to pay him – his annual salary, perks, and benefits.

14.     For years – both before and after January 1, 2018 – Mark surreptitiously took assets and resources, including cash, rightfully belonging to Shoreline for his own use.

15.     Mark did not tell anyone at Shoreline that he took, or was taking, these assets and resources – worth, at a minimum, a total of $500,000 in the aggregate. Shoreline learned of this theft only after the fact and immediately discontinued it.

16.    Commencing, upon information and belief, in or around 2010, Mark insisted that Shoreline pay Javiar Munive ("Javiar") as a W-2 employee to perform purely personal work, errands, and chores for Mark and his wife Kelli. For instance, Javiar would run personal errands for Mark and his wife, park cars and tend bar at private parties at their residence, and do other chores normally performed by a butler, valet, and/or personal assistant.

17.    Over Mark's self-interested protestations, Shoreline discontinued Javiar's "no show" employment in or around the 2nd quarter of 2018.

18.    In or around 2018, when Mark established Florida as his primary residence, he stopped performing any substantive work for Shoreline. At or around that time, he rarely came to the company's office and stopped engaging with the other shareholders or with other Shoreline employees and executives, except for his son, David A. Lionetti ("Mark's son"). Mark's son worked for Shoreline in its service and maintenance department, primarily overseeing small renovations. At or about this time, Mark stopped doing his job. Instead, he relaxed in Florida and played golf.

19.    During this period of inactivity, Shoreline continued to pay Mark his substantial base salary, bonuses, perks, and benefits. Mark was paid handsomely for doing little or no work for, and adding little if any value to, the Company.

20.    On or about June 20, 2023, David acquired, through an arms-length transaction, using millions of dollars of his personal funds and assets, his other brother Brian's 30% interest in Shoreline. After paying Brian millions of dollars in consideration, David owned, and he currently owns, 60% of the issued and outstanding shares of Shoreline. Mark owns 30% of the issued and outstanding shares of Shoreline and a trust owns the other 10% of Shoreline's shares.

21.    On July 26, 2023, Mark called a Special Meeting of Shoreline's Board of Directors.

At that time, the Board consisted of only Mark and David. At that meeting, Mark made several demands that clearly demonstrated that he put his own pecuniary interests ahead of the interests of the Company.

22.    Specifically, at that meeting Mark demanded the following:

a.    That he be allowed to maintain the status quo of not performing any real work, but that the Company continue to pay him his $400,000+ compensation package, including his base salary, bonuses, perks, and benefits for the remainder of his life. In articulating this demand, Mark explicitly stated that, if there was an economic downturn, Shoreline would be required to lay off its entire workforce before it could consider not paying him his full salary.

b.    That Shoreline give his son, a written lifelong employment contract – something not given to any other Shoreline employee or to any Lionetti family member; and

c.    That David transfer to him half of the shares that David acquired from Brian so that they would each effectively own half of the Company.

23.    David, as a fiduciary himself, declined each of Mark's demands.

24.    On or about July 31, 2023, at a duly convened and noticed Shareholders' meeting, Mark was voted off as a member of Shoreline's Board of Directors. At that meeting, it was resolved that Shoreline needed its Board to consist of individuals, unlike Mark, who were actively involved in the company and who were willing to commit to devote their full time and energy to the business of the Company.

25.    By unanimous written consent dated August 1, 2023, Shoreline appointed a new Board of Directors consisting of David, Richard Devine ("Devine"), its Chief Financial Officer, Daniel Kollar ("Kollar"), its Chief Operating Officer, and a fourth independent outside director.

26.    At a meeting of the new Board of Directors on August 2, 2023, Mark was removed

as an officer of the Company (Vice President and Corporate Secretary) and was replaced by Kollar as an officer, initially as Corporate Secretary and, later, as Vice President.

27.     On or about September 22, 2023 Mark commenced several actions against David, including in Connecticut surrogate's court, premised on the erroneous claim that neither David, nor Mark, nor Brian then owned, or ever owned, any of Shoreline's stock. Mark knew that these allegations were frivolous because, among other things, he had been receiving K-1 statements, and presumably paying income tax on the pass-through income reflected on those statements, since 2004. His accountant received K-1 statements from Shoreline detailing Mark's 30% ownership interest in Shoreline for some twenty (20) years. Mark never questioned or objected to the K-1 statements. Mark continues some of these lawsuits to date and has, in fact, commenced another lawsuit related to his 2023 K-1 statement, costing David and the Company significant monies and time to fight claims that Mark knew from the offset to be wholly without merit. In doing so, Mark again placed his personal interests ahead of the interests of Shoreline.

28.     Commencing, upon information and belief, in or about August of 2023, Mark and his son began surreptitiously to plan to open up a new competing business, Legacy Renovation & Pool Service, Inc. ("Legacy"). Mark and his son made these plans using Shoreline's confidential and proprietary information, including its client and client lead lists, its vendor and supplier information, its employee information, and its pricing information ("Shoreline's Confidential and Proprietary Information").

29.     On or about September 30, 2023, because, *inter alia*, Mark abstained from doing any real work for the Company and was inappropriately misappropriating company resources, Shoreline terminated Mark's employment and removed him from its payroll. Mark continues to own 30% of the Company and he continues to receive his K-1 statements.

30.     Legacy was incorporated, by and for Mark, under and pursuant to the laws of the State of Florida on March 22, 2024. On April 10, 2024 Legacy filed a certificate authorizing it to do business in Connecticut. Mark's son resigned from Shoreline on April 15, 2024. Since April 10, 2024, Legacy has solicited several employees from Shoreline's service division to come to work for it.

31.     Since April 10, 2024 Legacy has unsuccessfully attempted to poach one office employee from Shoreline's service division and, successfully poached, at least, three (3) field employees to come to work for it. In addition, Legacy has solicited, and is currently engaged to provide service work to, at least, twelve (12) of Shoreline's service clients. This is yet another instance of Mark's putting his own interest ahead of the interests of the Company.

32.     Commencing in or around January 1, 2024 and continuing to date, Mark has repeatedly accused David to several third parties of numerous instances of theft, dishonest mismanagement, and other unethical and wrongful conduct.

33.     Within the past several months, Mark told Joseph J. Capalbo II ("Capalbo"), a lawyer who has for years represented the Lionetti family in various matters, that David was a "liar" and a "cheat," who had stolen from him, their mother, Brian, and Shoreline. When Mark made these statements, he knew them to be false.

34.     Sometime during 2024, Mark also told "JR," a member of the Alpine Country Club, as reported to David by Steven Abramow, his brother-in-law, that David "lied" to, and "stole" from Mark, and that David "went behind his back" to "steal" Brian's shares in Shoreline and wrongfully froze him out of the company. When Mark made these statements, he knew them to be false.

## FIRST CAUSE OF ACTION
### (Theft and Conversion)

35.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1

through 34 of this Complaint as if set fort verbatim and at length herein.

36.    Over several years, Mark stole, at least $500,000 worth of assets and resources from Shoreline. Mark did not advise Shoreline that he took these assets and resources. He took these assets from Shoreline and kept them, without Shoreline's knowledge or permission. In addition, over a period of some ten years, Mark misused Company funds to pay his personal servant Javiar.

37.    In addition, commencing in or around 2023, Mark took Shoreline's Confidential and Proprietary Information, without Shoreline's knowledge or permission, and used it to open, and operate, Legacy, a competing business. He converted these items of Shoreline's property to his own use and spent the money and converted the information to a revenue-generating business.

38.    Mark's secretly taking Shoreline's assets and resources and Shoreline's Confidential and Proprietary Information, without its knowledge or permission, and his misuse of Company funds to pay Javiar as a no-show W-2 employee, constitutes civil theft and conversion.

39.    As a direct and proximate result of Mark's unlawful actions, Shoreline was damaged in the form of lost and unrecouped income and lost and unrealized service business revenue from the customers that Mark solicited and who now use Legacy to service their pools, and the amount of misused assets and resources.

WHEREFORE, Shoreline demands that judgement be entered against Mark for compensatory damages in an amount to be determined at trial, but, in no event, less than $750,000.00, together with applicable costs and interest, and such other and further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION

### (Tortious Interference with Contracts and Prospective Economic Advantage)

40.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 39 of this Complaint as if set forth verbatim and at length herein.

41.     Mark, using wrongful means (i.e. his misappropriation of Shoreline's Confidential and Proprietary Information), induced existing service clients of Shoreline to discontinue, breach, or not to renew, their service contracts with Shoreline and, instead, to use Legacy to service their pools.

42.     But for Mark's wrongful misappropriation and use of Shoreline's Confidential and Proprietary Information, these clients would have continued to contract with Shoreline.

43.     As a direct and proximate result of Mark's wrongful actions, Shoreline was, and continues to be, damaged in the form of lost service business revenue.

WHEREFORE, Shoreline demands that judgement be entered against Mark for compensatory damages to be determined at trial, but, in no event, less than $250,000, together with applicable costs, including reasonable attorneys' fees, and interest, and such other and further relief as this Court deems just and proper.

### THIRD CAUSE OF ACTION
**(Breach of Fiduciary Duty)**

44.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 43 of this Complaint as if set forth verbatim and at length herein.

45.     Mark is a 30% shareholder of Shoreline, a closely held private company. Until August 2, 2023, Mark was also an Officer and Director of Shoreline.

46.     As a substantial shareholder of a closely held private company and, until recently, an Officer and Director of that company, Mark owed Shoreline and the other shareholders of Shoreline, including David, a fiduciary duty. By virtue of this duty, Mark was required to act with the utmost good faith, exhibit loyalty, and to act in the best interests of the corporation.

47.     Mark breached his fiduciary duty to Shoreline and David by, (a) stealing Shoreline's assets and resources; (b) misusing its funds to employ a personal butler; (c) refusing to do any

work for Shoreline, while insisting that the Company continue to pay him his full-time salary and

benefits; (d) demanding lifetime no-show employment; (e) commencing a costly and vexatious

legal proceeding questioning his own stock ownership, that he knew to be factually erroneous; (f)

misappropriating Shoreline's Confidential and Proprietary Information; (g) opening and operating

Legacy, a competing business; and (h) using Shoreline's Confidential and Proprietary Information

both to poach Shoreline employees to come to work for Legacy and to solicit Shoreline's existing

and prospective service clients/customers and convince them instead to use Legacy.

48.     In each of the above instances, Mark improperly placed his pecuniary interests

ahead of the interests of Shoreline.

49.     As a direct and proximate result of Mark's breaches as aforesaid, Shoreline has

been, and continues to be, significantly damaged in the form of the stolen assets and resources,

unwarranted salary and benefits paid to Mark and to his personal butler, and lost business.

WHEREFORE, Shoreline and David demand that judgement be entered against Mark for

compensatory damages to be determined at trial, but, in no event, less than $1.5 million, punitive

damages to be determined at trial, but, in no event, less than $6 million, together with costs,

including reasonable attorneys' fees, and interest, and such other and further relief as this Court

deems just and proper.

## FOURTH CAUSE OF ACTION

### (Faithless Servant)

50.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1

through 49 of this Complaint as if set forth verbatim and at length herein.

51.     Mark repeatedly breached his duty of loyalty, manifested, as detailed above, by acts

undertaken by him that were, and are, detrimental to Shoreline's interests, including conversion,

theft, misappropriation of confidential and propriety information, abstaining from working, while

insisting on being paid, planning and commencing frivolous lawsuits, and engaging in activities that compete with Shoreline. These breaches were each intentional and substantial.

52.     Since January 1, 2018, at the latest, Mark has been a "faithless servant" to Shoreline, acting selfishly and to the extreme detriment of Shoreline's interests.

53.     By reason of this intentional, willful and deliberate disloyalty, Mark should forfeit all compensation earned, and benefits received, from Shoreline during the period of disloyalty (since, at least, January 1, 2018). Mark should also disgorge, and pay to Shoreline, any benefits or profits received from third parties, like the clients he poached from Shoreline, due to his breach of loyalty.

WHEREFORE, Shoreline demands that judgement be entered against Mark for compensatory damages, consisting of his forfeiture of all compensation earned, and benefits received from, Shoreline since January 1, 2018 and disgorgement of any benefits or profits received from third parties, in an amount to be determined at trial, but, in no event, less than $2.5 million, together with costs, including reasonable attorneys' fees, and interest, and such other and further relief as this Court deems just and proper.

## FIFTH CAUSE OF ACTION

### (Defamation)

54.     Plaintiffs repeat and allege each and every allegation contained in Paragraphs 1 through 53 of this Complaint as if set forth verbatim and at length herein.

55.     Mark has repeatedly, and continues repeatedly, to publish to third parties knowingly false and derogatory statements impugning David's honesty and integrity and describing his personal and business conduct as unethical.

56.     Mark has called David a "liar," a "cheat," and a "thief," all as detailed in Paragraphs 32, 33 and 34 of this Complaint.

57.     These false statements about David constitute defamation *per se*.

58.     As a direct and proximate result of Mark's defamation as aforesaid, David has suffered reputational damage and emotional pain and suffering.

WHEREFORE, David demands that judgement be entered against Mark for compensatory and punitive damages, both in amounts to be determined at trial, together with costs, including reasonable attorneys' fees, and interest, and such other and further relief as this Court deems just and proper.

**JURY DEMAND**

59.     Plaintiffs demand that this matter be tried before a jury.


Dated: November 19, 2024


Respectfully submitted,

Philip Russell, LLC


By: */s/ Philip Russell*
Philip Russell, Esq.
Federal Bar No. ct 03127
Cos Cob, Connecticut 06807
(203) 661-4200
efile@greenwichlegal.com


The Law Offices of Neal Brickman, P.C.


By: */s/ Ethan Y. Leonard*
Ethan Y. Leonard, Esq.
420 Lexington Avenue, Suite 2811
New York, New York 10170
(212) 986-6840
Ethan@Brickmanlaw.com
*Attorneys for Plaintiffs Shoreline Pool, Inc.*
*and David Lionetti*